IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| JONATHAN O. HAFEN, in his capacity as court-appointed Receiver,<br><br>    Plaintiff,<br><br>v.<br><br>PETER W. GUYON, an individual; PETER W. GUYON PC RETIREMENT PLAN; PETER W. GUYON PC ATTORNEY AT LAW; DR. PETER W. GUYON, JR., an individual; ELISABETH GUYON, an individual; BERT VAN UITERT, an individual; CATHERINE VAN UITERT, an individual; SILVER SPOON DELIVERY; and FLASH 1 TV,<br><br>    Defendants. | **MEMORDANDUM DECISION AND ORDER GRANTING RECEIVER'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br><br>Case No. 1:23-cv-00074-TC-DBP<br><br><br>Judge Tena Campbell<br>Magistrate Judge Dustin B. Pead |

This action is brought by Plaintiff Jonathan O. Hafen, the court-appointed Receiver over the assets of Rust Rare Coin, Inc., Gaylen Dean Rust, R Legacy Racing Inc., R Legacy Entertainment LLC, and R Legacy Investments LLC (collectively, the Receivership Defendants). This action is ancillary to litigation involving the Receivership Defendants. See Commodity Futures Trading Comm'n v. Rust Rare Coin, Case No. 2:18-cv-892.

Before the court are three motions for summary judgment. First, Defendants Peter W. Guyon, Peter W. Guyon PC Attorney at Law (Guyon PC), Dr. Peter W. Guyon, Jr., Elisabeth Guyon, Bert van Uitert, and Catherine van Uitert move for summary judgment on the ground that this action is barred by the doctrine of res judicata. (ECF No. 84.) These Defendants join Defendant Peter W. Guyon PC Retirement Plan (the Plan) in a second motion for summary

1

judgment for lack of subject matter jurisdiction and standing.  (ECF No. 85.)  The Receiver

brings a cross motion for partial summary judgment against all these Defendants (ECF No. 86)

but has since reached a settlement with Dr. Peter W. Guyon, Jr., Elisabeth Guyon, Bert van

Uitert, and Catherine van Uitert.  (See Stip. Mot. Approve Settlement, ECF No. 90.)  The court

approved that settlement and dismissed those four Defendants.[1]  (Order Granting Stip. Mot.

Approve Settlements, Oct. 24, 2025, ECF No. 91.)  Accordingly, the Receiver's motion for

partial summary judgment remains pending only against Peter W. Guyon, Guyon PC, and the

Plan (collectively, the Guyon entities).

For the following reasons, the court grants the Receiver's motion and denies the motions

filed by the Guyon entities.

## BACKGROUND

The Commodity Futures Trading Commission (CFTC) and the Utah Division of

Securities (UDOS) initiated a civil enforcement action against the Receivership Defendants on

November 13, 2018.  (Compl., ECF No. 1 in Case No. 2:18-cv-892.)  The CFTC and UDOS

alleged the Receivership Defendants had offered an investment opportunity (the Silver Pool),

through which the Receivership Defendants claimed to generate substantial returns for investors

by buying and selling physical silver.  (Id.)  The CFTC and UDOS also alleged the Silver Pool

was a Ponzi scheme, rather than a legitimate investment.  (Id.)

As part of the action against the Receivership Defendants, the court appointed Jonathan

O. Hafen (the Receiver) as Temporary Receiver for the assets of the Receivership Defendants.

---

[1] In addition to the four settling defendants, the Receiver previously dismissed two other
defendants.  (See Order Granting Stip. Mot. Dismiss, Jan. 10, 2024, ECF No. 31.)  Besides the
Guyon entities, there are two other defendants remaining in this action: Silver Spoon Delivery
and Flash 1 TV.  These defendants have never been served and have not entered an appearance.

(Order, Nov. 15, 2018, ECF No. 22 in Case No. 2:18-cv-892.)  On November 27, 2018, the court entered an order that, among other things, continued the Receiver's appointment until further order of the court.  (Order, Nov. 27, 2018, ECF No. 54 in Case No. 2:18-cv-892.)  The Receiver was charged with several tasks, including the investigation of the financial and business affairs of the Receivership Defendants and the recovery of the assets of the Receivership estate.  (Id.)

On June 21, 2023, the Receiver filed the above-captioned ancillary action, seeking to recover funds transferred to the Guyon entities and other defendants.  (See Compl., ECF No. 2.) On September 23, 2025, the Receiver filed the pending motion for partial summary judgment against the Guyon entities.  The Receiver alleges that the Guyon entities received $585,329 in excess of the contributions they made to the Silver Pool and seeks to recover this amount.  The Receiver submitted reports from Mr. Hafen and D. Ray Strong in support of the Motion, as well as a Declaration from Jeffrey T. Shaw.  (Report Jonathan O. Hafen, App'x A to Pl.'s Mot. Summ. J., ECF No. 86-2; Report D. Ray Strong, App'x B to Pl.'s Mot. Summ. J., ECF No. 86-3; Decl. Jeffrey T. Shaw, App'x C to Pl.'s Mot. Summ. J., ECF No. 86-4.)

The Guyon entities filed two motions for summary judgment—on September 4, 2025, and September 20, 2025—arguing that the court has no jurisdiction and that the claims against them are barred by the principles of res judicata.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those that might affect the outcome of the case.  See Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment."). "At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'" Argo v. Blue Cross Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). But courts should disregard statements that could not be presented at trial in any admissible form. See id.

Once the movant shows there is an absence of a genuine dispute of material fact, Celotex, 477 U.S. at 323, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[W]hile [courts] draw all reasonable inferences in favor of the non-moving party, 'an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'" GeoMetWatch Corp. v. Behunin, 38 F.4th 1183, 1200 (10th Cir. 2022) (quoting Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A., 858 F.3d 1324, 1334 (10th Cir. 2017)).

## ANALYSIS

### I.    The Silver Pool Was a Ponzi Scheme

In multiple ancillary actions, this court has found that the Silver Pool operated as a Ponzi scheme. See Hafen v. Famulary, No. 2:19-cv-627, 2021 WL 229356, at *4–5 (D. Utah Jan. 22, 2021); Hafen v. Brimley, No. 2:19-cv-875, 2021 WL 1424713, at *5 (D. Utah Apr. 15, 2021); Hafen v. Evans, No. 2:19-cv-895, 2021 WL 3501658, at *3 (D. Utah Aug. 9, 2021); Hafen v. Howell, No. 2:19-cv-813, 2023 WL 2188566 (D. Utah Feb. 23, 2023). And the Tenth Circuit has affirmed a judgment against a defendant where this court held that there was no genuine

dispute of material fact about whether the Silver Pool was a Ponzi scheme.  Hafen v. Howell, 121 F.4th 1191, 1200 (10th Cir. 2024) (upholding judgment against Leslie Howell but remanding for further proceedings about the appropriate value of the judgment against Gretchen Howell). Notably, the Tenth Circuit considered and overruled objections to the court's reliance on the same evidence that the Receiver provides in this action, including the Hafen Report, the Strong Report, and the Shaw Declaration.  Id. at 1202–03.

Accordingly, there is no genuine dispute about whether the Silver Pool operated as a Ponzi scheme.  Indeed, as the court discusses below, the Guyon entities do not object to this finding.  Nevertheless, the court summarizes the evidence showing that the Receivership Defendants operated a Ponzi scheme, as the Receiver's claims against the Guyon entities stem from this central determination.

The Receivership Defendants solicited funds from investors by representing that they would use such funds to trade physical silver, which would generate returns for investors. (Hafen Report 12–13; Strong Report 39.)  Specifically, the Receivership Defendants represented that one-half of invested funds would be used to purchase physical silver, which would be stored at Brink's facilities.  (Id.)  According to the Receivership Defendants' representations, the remaining one-half of the invested funds would be used to buy and sell physical silver on the commodities market, thereby increasing the investor's silver holdings over time and generating returns on the investment.  (Hafen Report 12; Strong Report 39.)

In reality, investor funds were not used to purchase physical silver.  (Hafen Report 13– 14; Strong Report 39.)  Mr. Rust admitted that new investor funds were used to pay returns to existing investors and to fund other businesses that were unrelated to the Silver Pool.  (Strong Report 39–40.)  Although the Receivership Defendants represented that they managed over

$80 million of physical silver and that approximately one-half of that amount was stored at Brink's locations in Salt Lake City and Los Angeles, there is no evidence that the Receivership Defendants ever stored significant amounts of physical silver at Brink's or any other facility. (Id. at 39, 49–51.)  Mr. Rust admitted that there was no significant amount of silver stored at Brink's at the time of the Receiver's appointment.  (Hafen Report 13; Strong Report 50–51.) There is no evidence that the Receivership Defendants ever traded significant amounts of physical silver on a regular basis in the manner represented to investors.  (Hafen Report 13; Strong Report 51.)

Since 2008, the Receivership Defendants raised at least $225 million from over 500 investors and paid out at least $175 million to investors.  (Strong Report 6–7.)  As early as 2008, the net operating income obtained through the Receivership Defendants' limited business operations was insufficient to make payments to investors.  (Id. at 6, 23.)  The payments made to investors since 2008 could only have been sourced from funds raised from other investors, as there was no other source of funds from which these payments could have been made.  (Id. at 76–77.)

From 2008 through the appointment of the Receiver in 2018, the Receivership Defendants continued to take in ever-increasing funds from investors and to pay out exorbitant returns.  Between January 1, 2018, and November 15, 2018, the Receivership Defendants paid more than $37 million to investors.  (Summary of RRC Bank Account Activity by Year, January 1, 2012, through November 15, 2018, Ex. 25 to Strong Report, EX194.)  The Receivership Defendants represented that the Silver Pool was "risk free," "no risk," or "virtually risk free" because the investment was backed by physical silver, which would always have value. (Hafen Report 6; Strong Report 47.)  The Receivership Defendants guaranteed "no loss of

principle [sic]" invested.  (Summary of Gaylen Rust Investor Representations, Ex. 8 to Strong

Report, EX104.)  The Receivership Defendants represented that the Silver Pool paid an average

return of 20–25%.  (Strong Report 44.)  The Receivership Defendants represented that returns

between 2012 and 2017 exceeded 40%.  (Decl. Howard Hess, Ex. 35 to Strong Report, EX235–

36).  The Receivership Defendants represented that the lowest return on the Silver Pool

investment during a thirty-year period was 12%.  (Strong Report 44.)  Investor statements

provided by the Receivership Defendants reflected that every silver trade was profitable and that

the Receivership Defendants had never lost money on a trade.  (Id. at 7.)  The Receivership

Defendants promoted the Silver Pool as an exclusive program offered only to those investors Mr.

Rust knew personally.  (Id. at 58–59.)  The Receivership Defendants falsely claimed to have a

trading relationship with HSBC, one of the world's largest banks, and to employ a proprietary

trading algorithm that allowed the Receivership Defendants to beat the market.  (Hafen

Report 21; Strong Report 49–50.)  The Receivership Defendants paid exorbitant returns to

investors for years, creating the false impression that profits were being earned and thereby

attracting new investors to the scheme and convincing existing investors to increase their

investment.  (Strong Report 7.)  Investors likely suffered in excess of $100 million in net

principal losses.  (Id. at 77.)

    A Ponzi scheme is "an investment scheme in which returns to investors are not financed

through the success of the underlying business venture, but are taken from principal sums of

newly attracted investments."  In re M & L Bus. Mach. Co., Inc., 84 F.3d 1330, 1332 n.1 (10th

Cir. 1996) (quoting In re Hedged-Investments Assocs., Inc., 48 F.3d 470, 471 n.2 (10th Cir.

1995)).  To "show that an investment scheme falls within the definition of a Ponzi scheme, the

Receiver must prove by a preponderance of the evidence the sine qua non of a Ponzi scheme:

that returns to earlier investors were paid by funds from later investors." S.E.C. v. Mgmt. Sols., Inc., No. 2:11-cv-1165, 2013 WL 4501088, at *19 (D. Utah Aug. 22, 2013). It is also important "that the Receiver shows that returns to investors could not be paid by the underlying business venture," id., because, by definition, Ponzi schemes are insolvent from their start. Klein v. Cornelius, 786 F.3d 1310, 1320 (10th Cir. 2015).

> Other factors, though non-essential to the definition of a Ponzi scheme, have been used by courts to decide if an investment scheme fits into the Ponzi definition. These include the promise of large returns; the promise of returns with little to no risk; the promise of consistent returns; the delivery of promised returns to earlier investors to attract new investors; the general insolvency of the investment scheme from the beginning; the secrecy, exclusivity, and/or complexity of the investment scheme; and the general stability of the investment scheme, among other factors.

Mgmt. Sols., Inc., 2013 WL 4501088, at *19 (footnotes omitted).

Here, as in past RRC ancillary cases, the undisputed material facts from the Hafen Report prove the sine qua non of a Ponzi scheme: the Receivership Defendants diverted investor funds to other RRC-affiliated businesses and to pay returns to existing investors. The undisputed material facts show that there is no evidence of purchases or sales of silver in volumes necessary to sustain the Silver Pool and, similarly, no evidence that the Receivership Defendants ever stored the quantities of silver that were represented to investors. (See, e.g., Hafen Report 16.) Mr. Strong's analysis also supports a determination that the Silver Pool was a Ponzi scheme. These facts show that payments made to investors could only have been from funds received from other investors and that there was no other source of funds from which these investor payments could have been made. (See, e.g., Strong Report 76–77.)

The court holds that, instead of a legitimate investment opportunity, the Silver Pool operated as a classic Ponzi scheme.

## II.    Utah Uniform Voidable Transactions Act

Under the Utah Uniform Voidable Transactions Act (UVTA), a transfer is voidable "if

8

the debtor made the transfer … with actual intent to hinder, delay, or defraud any creditor of the debtor." Utah Code Ann. § 25-6-202(1)(a). The UVTA allows a creditor to obtain "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim[.]" Id. § 25-6-303(1)(a); see also id. § 25-6-304(2)(a) ("[T]o the extent a transfer is avoidable in an action by a creditor under Subsection 25-6-303(1)(a), … the creditor may recover judgment for the value of the asset transferred …."). "In the context of a Ponzi scheme, … 'the mere existence of a Ponzi scheme is sufficient to establish a defendant's actual intent to defraud.'" Hafen v. Brimley, 2021 WL 1424713, at *4 (quoting Klein v. Nelson, No. 13-cv-497, 2015 WL 4545748, at *2 (D. Utah July 28, 2015)); see also Wing v. Dockstader, 482 F. App'x 361, 363 (10th Cir. 2012) (same). "[A] receiver of an entity which was used to perpetrate a Ponzi scheme has standing to recover fraudulent transfers as though the receiver were a creditor of the scheme." Brimley, 2021 WL 1424713, at *4 (quoting Dockstader, 482 F. App'x at 363).

Where a Receiver "establishes that the debtor operated as a Ponzi scheme, all transfers by the debtor entity are presumptively fraudulent and are subject to avoidance." Id. at *5; see also Howell, 121 F.4th at 1200 (clarifying that Tenth Circuit precedent concerning the Ponzi presumption in cases involving Utah's Uniform Fraudulent Transfer Act extends to the UVTA). "The recipient of funds from the Ponzi scheme then bears the burden of demonstrating that (1) the funds were received in good faith and (2) in exchange for reasonably equivalent value." Brimley, 2021 WL 1424713, at *5 (citing Klein v. King & King & Jones, P.C., No. 2:12-cv-51, 2013 WL 4498831, at *2 (D. Utah Aug. 19, 2013)). "[A]n investor in a Ponzi scheme does not exchange reasonably equivalent value for payments which exceed the investor's investments." Miller v. Wulf, 84 F. Supp. 3d 1266, 1274 (D. Utah 2015). And because the Silver Pool operated as a Ponzi scheme, "amounts received by investors in excess of their

principal investment—i.e., an investor's 'profits' from the scheme—[were] not received in exchange for reasonably equivalent value and must be returned to the Receivership Estate." Brimley, 2021 WL 1424713, at *5.

Accordingly, the Receiver need only establish that the Guyon entities received distributions in excess of their payments deemed contributions to the Receivership Defendants and calculate the amount of that difference.

### III.    The Guyon Entities' Objections

Before turning to the amounts that the Guyon entities contributed to and received from the Ponzi scheme, the court first addresses the arguments the Guyon entities raise concerning res judicata, jurisdiction, whether the Guyon entities can be said to have invested in the scheme, and other objections.

### A.    Res Judicata and Collateral Estoppel

First, the Guyon entities argue that the entire action is barred by res judicata, an argument that the court finds wholly unpersuasive.  The Tenth Circuit has set forth the following test to determine whether the doctrine of res judicata applies:

> Res judicata requires the satisfaction of four elements: (1) the prior suit must have ended with a judgment on the merits; (2) the parties must be identical or in privity; (3) the suit must be based on the same cause of action; and (4) the plaintiff must have had a full and fair opportunity to litigate the claim in the prior suit.

Nwosun v. Gen. Mills Restaurants, Inc., 124 F.3d 1255, 1257 (10th Cir. 1997) (citation omitted).

The Guyon entities argue that the Receiver is in privity with the Department of Justice (in the criminal case against Mr. Rust), with the Securities and Exchange Commission (in the civil action against RRC and Mr. Rust), and with the CFTC and the UDOS (in the Receivership case). But the court need not address this flawed premise because the Guyon entities make no attempt,

nor could they, to show that they are in privity with RRC, Mr. Rust, or any of the other Receivership Defendants. This action concerns the Receiver's claim that the Guyon entities were net winners who profited from the Ponzi scheme. This claim has never been litigated and is entirely separate from any criminal or civil claims against the Receivership Defendants. As discussed above, any transfers from a debtor operating as a Ponzi scheme are presumptively fraudulent and a court-appointed Receiver may bring an action against the recipient of such funds to void the transfer.

The Guyon entities' claim that the Receiver is collaterally estopped from bringing this action as a matter of issue preclusion is similarly unpersuasive. The party invoking the doctrine of collateral estoppel has the burden of establishing that "the issue previously decided is identical with the one presented in the action in question[.]" Stan Lee Media, Inc. v. Walt Disney Co., 774 F.3d 1292, 1297) (10th Cir. 2014) (citation omitted). As discussed above, the question of whether the Guyon entities profited from the Ponzi scheme was not litigated in the criminal and civil actions against the Receivership Defendants. Accordingly, the doctrine of collateral estoppel does not apply.

## B. Standing and Subject Matter Jurisdiction

The Guyon entities next argue that the Receiver lacks standing to bring this action and that the court lacks subject matter jurisdiction to hear it. But in an appeal from a decision in a separate ancillary matter, the Tenth Circuit has confirmed that the CFTC enforcement action was proper, that federal courts have jurisdiction to hear these kinds of ancillary state-law claims, and that the Receiver has standing to pursue them:

> Our subject-matter jurisdiction derives from the CFTC enforcement action, which was brought under the Commodities Exchange Act. See 7 U.S.C. § 13a-1; see also Commodity Futures Trading Comm'n v. Rust Rare Coin, No. 2:18-CV-892-TC-DBP, at 6 ¶ 9, 2018 WL 8966792 (D. Utah Dec. 6, 2018) (ECF No. 56). A

receiver appointed in such an action may bring ancillary state-law claims in federal court against individuals alleged to have received unlawful transfers. 28 U.S.C. §§ 754, 1367(a); Klein v. Cornelius, 786 F.3d 1310, 1315 (10th Cir. 2015) (federal courts have jurisdiction over ancillary state-law claims); see Klein v. Roe, 76 F.4th 1020, 1029 (10th Cir. 2023) (receiver has standing to recover fraudulent transfers).

Howell, 121 F.4th at 1197 n.1.  Because there is no relevant distinction between the ancillary action at issue in Howell and the ancillary action against the Guyon entities, the court finds that the Tenth Circuit's decision is dispositive of the Guyon entities' jurisdictional arguments.

### C. Investment in the Silver Pool

The Guyon entities next maintain that they never contributed funds to the Silver Pool but instead purchased silver bullion directly as part of a "Silver Purchase Agreement."  (Decl. Peter W. Guyon, ECF No. 88-2 at ¶ 17.)  Specifically, Mr. Guyon asserts that he and Mr. Rust "entered into a verbal executory contract pursuant to the terms of which RRC and Rust agreed, as my agents, to purchase increasingly larger amounts of physical silver bullion for me and on my account …."  (Id.)  Mr. Guyon further attests that "Rust had my authority to buy silver bullion in a downward market and to sell silver bullion in an upward market" and that "only one-half (1/2) of the accumulated silver bullion was to be available for sale, and the other one half (1/2) was to remain in storage …."  (Id. ¶¶ 22, 30.)  Mr. Guyon states that he was unaware of any Silver Pool or pooling arrangement and that Mr. Rust once showed him a vault of silver, telling him that Mr. Guyon's "earmarked silver was part of the physical bullion" he was shown. (Id. ¶ 29.)

Regardless of whether Mr. Guyon and Mr. Rust ever discussed a Silver Pool, Mr. Guyon's description of the Silver Purchase Agreement with Mr. Rust matches what Mr. Rust told other investors: namely, that RRC would use one-half of received funds to purchase physical silver while the remaining one-half of funds would be used to buy and sell physical silver,

thereby generating returns.  (Hafen Report 12–13; Strong Report 39.)  Mr. Guyon even recognizes that Mr. Rust "was purchasing silver bullion for 'about 40' other principals as their agent with whom he had similar agreements to mine but declined to divulge their names or the details of their agreements as 'confidential.'"  (Guyon Decl. ¶ 35.)  Mr. Guyon overlooks the suspicious nature of these dealings and instead emphasizes that Mr. Rust never referred to the principals as investors or mentioned a Silver Pool or other common fund.  (Id.)  But Mr. Guyon's subjective belief that he was not an investor to a common fund is insufficient to contradict the uncontroverted evidence of what the Receivership Defendants were actually doing with Mr. Guyon's money.  Indeed, Mr. Guyon neglects to consider that Mr. Rust was lying to him, just as Mr. Rust was lying to everyone who thought they were participating in legitimate purchases of silver bullion.

Mr. Guyon fails to raise a genuine issue about whether his payments to the Receivership Defendants should be treated as separate and unique because Mr. Guyon does not present any evidence that rebuts the Receiver's central findings—namely, that RRC operated as a Ponzi scheme and that the Receivership Defendants commingled the funds they received from individuals and entities like Mr. Guyon and the other Guyon entities.  Specifically, Mr. Strong found as follows:

> The nature and continuous commingling of funds by RRC made it impossible to segregate which funds belonged to RRC and which funds belonged to the investors.  During the RRC Bank Account Analysis Period, RRC used its funds, regardless of their nature, held in the RRC Bank Accounts as an interchangeable cash source, failing to discriminate between investor-related funds and business operating funds.  Not only were investor funds not maintained in a segregated bank account by RRC, but they were also used for purposes not intended by the investors.

(Strong Report 75.)

In addition, Mr. Guyon provides no evidence other than his own declaration of his

purported Silver Purchase Agreement with Mr. Rust.  Mr. Guyon similarly fails to show how legitimate changes in the silver market could have resulted in Mr. Guyon receiving over 2.5 times the amount of money he paid to the Receivership Defendants over a six-year period. Essentially, Mr. Guyon asks the court to deny summary judgment solely on the basis of his earnest belief that the Receivership Defendants kept his money and silver separate from other investors' funds and that the money he received in return was the result of smart investments by Mr. Rust that had nothing to do with the over $100 million in losses suffered by other investors. But "statements of mere belief must be disregarded at the summary judgment stage." GeoMetWatch Corp., 38 F.4th at 1200 (cleaned up).  This kind of magical thinking, devoid of any evidentiary support, is insufficient to preclude the entry of summary judgment.

### D.  Attorney Fee Agreement

The Guyon entities assert that summary judgment is precluded due to an additional oral agreement.  Mr. Guyon asserts that he and Mr. Rust "agreed that beginning on April 1, 2012, attorney fees incurred by Gaylen, RRC, the Rust family, and Gaylen's businesses for legal services to be provided by Guyon PC would accrue at the rate of up to $7,500 per month …." (Guyon Decl. ¶ 19.)  Under this arrangement, Mr. Guyon would not charge separately for his legal services as long as the value of his silver increased by at least $7,500 per month.  (Id.)  Mr. Guyon notes that it was "not until November 15, 2018 that I learned that there were no actual increases in silver bullion," a statement that is in tension with his previous assertions that his money and silver were kept separate from any Silver Pool.  (Id. ¶ 20.)  That contradiction aside, Mr. Guyon asserts that, because the silver bullion he purchased had not actually increased in value as Mr. Rust had represented, the attorney fee agreement was "triggered … for the entire time period."  (Id.)  And because the time period in question was 78.5 months (from April 1,

14

2018, through November 15, 2018), Mr. Guyon claims he is owed $588,750 in attorney fees. (Id.)  Rather serendipitously, this amount is almost exactly the amount ($585,329) that the Receiver seeks to recover in this action.

Unfortunately for the Guyon entities, Mr. Guyon again fails to provide any evidentiary support for his assertions.  He has presented no evidence of an attorney fee agreement, either written or oral, and he has presented no evidence of any billing records, time sheets, or even a detailed description of the legal services he claims to have provided the Rust family.[2]  Given Mr. Guyon's failure to detect or dissuade his clients from criminal activities that resulted in over $100 million in investor losses, it does not appear that these legal services were extensive.  In any event, a factual dispute is not genuine "if the nonmovant can do no more than simply show that there is some metaphysical doubt as to the material facts."  GeoMetWatch Corp., 38 F.4th at 1200 (cleaned up).  The existence of an unrecorded attorney fee agreement that exactly compensates Mr. Guyon for the fraudulent transfers the Receiver seeks to recover is both implausible and too speculative to prevent the entry of summary judgment.

### E.  Real Party in Interest

Finally, the Guyon entities maintain that there is a genuine issue of material fact about "[w]hether Peter Guyon individually or whether Guyon PC is the real party in interest in this action …."  (Defs.' Resp. Mot. Summ. J., ECF No. 88 at 22.)  The Guyon entities object to the Receiver's treatment of them as a unit and suggest that a jury must determine whether the

---

[2] In contrast, the Receiver has identified several legal bills from the Guyon entities during the relevant time period.  (See Shaw Decl. ¶ 16 & n.7.)  For instance, the Receiver found one bill totaling $4,468.75 for all activity between November 2013 and September 2016.  (Id. ¶ 16 n.7.) Two other bills for months prior to April 2012 were both for less than $7,500 per month.  (Id.) These bills do not affect the amount of recovery the Receiver seeks because the Receiver did not include any payments that the Receivership Defendants recorded as legal fees in the calculation of disbursements to the Guyon entities.  (Id. ¶ 15 n.6.)

Receivership Defendants transacted entirely with Guyon PC or with Mr. Guyon individually. The Guyon entities also suggest that the third Guyon entity (the Plan) "did not actually exist as a legal entity, and even if it did, it had no assets and was promptly abandoned." (Guyon Decl. ¶ 14 n.1.)

The court is unpersuaded that summary judgment is precluded by any confusion between Mr. Guyon, Guyon PC, and the Plan. First, the Receiver submits evidence that the Receivership Defendants made payments of $935,552 to the Guyon entities. (Investment Payments, Exs. 16–162 to Shaw Decl., ECF No. 86-4 at 67–393.) Of these payments, two checks for $10,000 each were made out to "Peter Guyon P.C." (See id., Exs. 16–17, ECF No. 86-4 at 67–70.) The remainder of the payments were in the form of checks to "Peter Guyon," RRC receipts referencing "Peter Guyon" or "Peter G," or reflected in RRC account statements for "Peter Guyon." (See id., Exs. 18–162, ECF No. 86-4 at 71–393.) The Guyon entities do not dispute that they received $935,552 in distributions from the Receivership Defendants. (See ECF No. 88 at 21 (failing to respond to the Receiver's assertion).) Instead, Mr. Guyon states that all amounts contributed to the Receivership Defendants "were contributed by Guyon PC" and that it was Mr. Guyon's "intent to act as agent or nominee to Guyon PC to receive any payments or trades from Rust and/or RRC on behalf of Guyon PC not by myself individually." (Guyon Decl. ¶ 16.)

Regardless of Mr. Guyon's "intent," the payments from the Receivership Defendants (with the exception of the two checks totaling $20,000) were made out in Mr. Guyon's name and do not mention Guyon PC. It is therefore Mr. Guyon's burden to bring forward some other evidence that these funds should be attributed solely to Guyon PC. Instead, Mr. Guyon notes that he deposited at least $364,500 in a bank account in the name of "Peter W. Guyon" that he "used both as a business account and personal account[.]" (Id. ¶¶ 24, 26.) Mr. Guyon admits

that many of the other payments did not contain deposit information or were cash payments to "Peter Guyon." (Id.) And Mr. Guyon does not mention anything about several of the payments. (See id. (neglecting to refer to many of Mr. Shaw's exhibits, such as exhibits 25–27, 50, etc.).) At most, Mr. Guyon asserts that, although payable to "Peter Guyon," he deposited checks totaling $163,000 in a business account for Guyon PC.[3] (Id.) In sum, Mr. Guyon raises the possibility that $183,000 (consisting of $163,000 deposited in Guyon PC's account and $20,000 in checks made out to Guyon PC) are properly attributed to Guyon PC. The court finds no genuine dispute that the remaining $752,552 is properly attributed to Mr. Guyon, as these funds were made out to Mr. Guyon's name and either provided in cash, deposited in accounts unknown, or deposited in an account under Mr. Guyon's name that even Mr. Guyon admits he used for both business and personal purposes.

Given these facts, the court finds that it need not consider further whether the money received by the Guyon entities must be segregated into separate analyses for Mr. Guyon and Guyon PC. That is so because the Guyon entities benefit from their treatment as a single investment group by the Receiver. If the Receiver calculated Mr. Guyon's and Guyon PC's net winnings and losses separately, then Mr. Guyon would be liable for $752,552, as he did not make any individual contributions to the Receivership Defendants. Meanwhile, Guyon PC would have made contributions of $350,223[4] and received disbursements of $183,000. Accordingly, Guyon PC would be a net loser and could submit a claim for $167,223. But to recover on this claim, Guyon PC would have to stand in line with the hundreds of other investors

---

[3] Mr. Guyon provides no bank records to support this assertion.

[4] The court discusses this amount further below. These contributions include two payments made by the Plan. While Mr. Guyon asserts that the Plan no longer exists as a legal entity, he does not object to including the Plan's contributions in this amount, as this inclusion reduces the total liability for the Guyon entities.

who lost money in the Ponzi scheme and would only receive a percentage of those funds. By considering the Guyon entities as one investment group, the Receiver's treatment allows these entities to reduce their net winnings by the full amount of the contributions they made. Separating out the claims between Mr. Guyon and Guyon PC would result in a higher judgment against Mr. Guyon and less opportunity for Guyon PC to recover the amounts it contributed. This extra litigation would not benefit anyone.

Finally, the court notes that Mr. Guyon has again failed to submit any evidence besides his declaration about how he managed Guyon PC, where he deposited the funds he received in his name, and how he maintained appropriate corporate formalities such that it would be appropriate to render separate judgments against Mr. Guyon as an individual and Guyon PC as an entity. It does not appear that RRC made any distinction between Mr. Guyon personally and Guyon PC as a business. And Mr. Guyon admits that he commingled funds for business and personal purposes in at least one of his accounts. For these reasons, the court finds that the Receiver's treatment of the Guyon entities as one investment group is appropriate and does not preclude summary judgment.

## IV.    The Guyon Entities' Investments and Disbursements

Having determined that none of the Guyon entities' objections precludes the entry of summary judgment, the court now determines the appropriate amount of that judgment.

The Receiver supports his computation of the transfers to and from the Guyon entities with the Shaw Declaration. (ECF No. 86-4.) That declaration contains a summary of the amounts contributed and received by the Guyon entities. (See Summary of Guyon Contributions & Payments, Ex. 3 to Shaw Decl., ECF No. 86-4 at 24–27.) Mr. Shaw corroborates each of the entries in this exhibit with checks and receipts. (See Investment

Contributions & Payments, Exs. 7–162 to Shaw Decl., ECF No. 86-4 at 33–393.)

The court has carefully reviewed the Shaw Declaration and agrees with the Receiver's conclusions—namely, that the Guyon entities contributed $350,223.20 to the Receivership Defendants and received disbursements totaling $935,552 from April 2012 to November 2018. (Shaw Decl. ¶¶ 12–13.)  The court therefore agrees with the Receiver that the Guyon entities received $585,328.80 in excess of their investments.

As noted above, the Guyon entities do not dispute that they received $935,552 in disbursements.  (See ECF No. 88 at 21 (failing to respond to the Receiver's assertion).)  But the Guyon entities maintain that they contributed $409,761.02 to the Receivership Defendants, not $350,223.20.  (Id. at 13.)  This discrepancy is easily resolved.

Although the Guyon entities do not include in their briefing the documentation on which they relied to calculate the amount of contributions, both Mr. Guyon and Guyon PC submitted claims to the Receivership estate for these amounts, and the Receiver has included these forms in his briefing.  (See Claim Forms, App'x D to Receiver's Mot. Summ. J., ECF No. 86-5.) Comparing those forms with the Shaw Declaration demonstrates that the parties largely agree about the amount of contributions.[5]  (Compare id. at 12, with ECF No. 86-4 at 24.)  The parties agree that Guyon PC wrote a check for $32,200 on April 9, 2012; a check for $60,000 on December 14, 2012; and a check for $44,000 on August 7, 2013.  (Id.)  The parties further agree that RRC records reflect investment contributions of $33,000 on December 21, 2012, and $29,518.20 on February 22, 2013.  (Id.)

There is a minor disagreement about the amount of a contribution made on

_____

[5] The Guyon entities repeat these numbers in their briefing the documents on which they relied to calculate these contributions are only available in the claim forms.  (See ECF No. 85 at 10; ECF No. 86-5.)

January 18, 2013.  The Receiver asserts that this amount is $65,180 (see ECF No. 86-4 at 24), whereas the Guyon entities claim this amount is $65,192.82 (see ECF No. 86-5 at 12).  The Receiver is correct, as the relevant documents on which both parties rely reflect a payment of $65,180.  (See ECF No. 86-4 at 43; ECF No. 86-5 at 24.)

Second, there is a minor disagreement about the amount of a contribution made by the Plan on October 31, 2013.  The Receiver asserts that this amount is $19,575 (see ECF No. 86-4 at 24), whereas the Guyon entities claim this amount is $20,000 (see ECF No. 86-5 at 12).  The Receiver's figure is more reliable, as the Receiver provides the check and not simply the RRC account statement.  (Compare ECF No. 86-4 at 66, with ECF No. 86-5 at 33 (reflecting, in any event, a payment of $19,559.68, not $20,000).)

Third, the Receiver includes a payment from the Plan on June 3, 2013, for $26,750, whereas the Guyon entities do not.  (Compare ECF No. 86-4 at 24, with ECF No. 86-5 at 12.) But the Guyon entities do not contest the inclusion of this payment, as the additional payment offsets some of the disbursements the Guyon entities received.  Indeed, this payment explains the $26,750 discrepancy between the amount claimed by the Guyon entities in their claim forms (see ECF No. 86-5 at 12 (asserting contributions of $383,011.02)) and the amount claimed in their briefing (see ECF No. 88 at 13 (asserting contributions of $409,761.02)).

Finally, the parties dispute the total contributions paid on May 29, 2013.  The Guyon entities assert that there were two contributions that day: one for $40,000, and one for $59,100. (See ECF No. 86-5 at 12.)  The Receiver includes only the $40,000 contribution and argues that the Guyon entities have double counted:

> Specifically, on 5/29/13 Guyon claims two contributions in the total amount of $99,100.  Based on its review of the Rust Rare Coin bank records and investor statements, BRG [the Berkeley Research Group] identified two checks in the amounts of $3,000 and $59,100 that were deposited by Peter Guyon on this date.

> According to the investor statements, $40,000 was attributed to Peter Guyon and $22,100 was attributed to Debra Peterson.  In his filed proof of claim Peter Guyon has included both the $40,000 that was attributed to him, as well as the check for $59,100.

(Shaw Decl. ¶ 12 n.3.)

The evidence matches the Receiver's description.  The Receiver has submitted the checks for $3,000 and $59,100, a receipt showing that $22,100 was attributed to "Debra," and RRC's account statement for "Peter G." showing an investment of $39,978 on May 29, 2013.  (See ECF No. 86-4 at 49–56.)  In contrast, the Guyon entities only provide evidence of the $59,100 check and the account statement showing the $39,978 investment on May 29, 2013.  (See ECF No. 86-5 at 48, 62.)  The RRC account statement does not show an additional investment of $59,100 that day.  Accordingly, the court agrees with the Receiver's description of this transaction and finds that the Guyon entities have overcounted by $59,100.  Removing that payment from the Guyon entities' calculations (and adjusting for the two other minor discrepancies noted above), the parties agree that the Guyon entities made contributions totaling $350,223.20.

Subtracting that amount from the $935,552 that the Guyon entities received as disbursement, the Guyon entities therefore received $585,328.80 in excess of their contributions.  The court finds that there are no genuine issues of material fact about this calculation.

## V.    Prejudgment Interest

The Receiver requests prejudgment interest on this amount.  The court agrees with the Receiver that prejudgment interest from the last date a distribution was made—November 13, 2018—is appropriate.  The Tenth Circuit has previously upheld the award of prejudgment interest at a rate of 5% per annum to a receiver for a fraudulent transfer claim because prejudgment interest "compensates for the loss of use of the money" and "[u]nder fairness and equity principles, prejudgment interest was proper."  Wing v. Gillis, 525 F. App'x 795, 801 (10th

21

Cir. 2013); see also Miller v. Kelley, No. 1:12-cv-56, 2014 WL 5437023, at *7 (D. Utah Oct. 27, 2014). Moreover, the Tenth Circuit has recently upheld this court's similar award of prejudgment interest at a 5% interest rate in another action ancillary to the Rust Rare Coin litigation. Howell, 121 F.4th at 1205.

The court therefore awards the Receiver prejudgment interest at the rate of 5% per annum from November 13, 2018, the last date the Guyon entities received a transfer from the Receivership Defendants. That amount equals $214,567.11. The total judgment against the Guyon entities is therefore $799,895.91. Post-judgment interest is also recoverable under 28 U.S.C. § 1961(a).

## VI. Remaining Claims

There are several loose ends to tie up in this matter. First, although the Receiver has only moved for partial summary judgment, the court's decision provides the Receiver complete relief on his fraudulent transfer claims. There is therefore no need for the court to rule on the Receiver's unjust enrichment claims.

Second, the court notes that the Receiver has never served Defendants Silver Spoon Delivery and Flash 1 TV, nor have these Defendants entered an appearance. Because it would be untimely to serve these Defendants now, the court dismisses the claims against them.

Finally, the court dismisses the counterclaims filed by Mr. Guyon and Guyon PC. (See Counterclaims, ECF No. 37 at ¶¶ 51–87.) These counterclaims are all asserted against either Gaylen Rust or RRC, who are not parties to this action.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1. The Receiver's Motion for Summary Judgment (ECF No. 86) is GRANTED.

2.    The Guyon entities' First and Second Motions for Summary Judgment (ECF Nos. 84 & 85) are DENIED.

3.    The court awards the Receiver $799,895.91 against Defendants Peter W. Guyon, Peter W. Guyon PC Attorney at Law, and the Peter W. Guyon PC Retirement Plan, jointly and severally.  This amount represents $585,328.80 in fraudulent and voidable transfers and $214,567.11 in prejudgment interest.

4.    The court's judgment shall bear interest calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.  See 28 U.S.C. § 1961(a).

5.    The court DISMISSES the claims against Defendants Silver Spoon Delivery and Flash 1 TV.

6.    The court DISMISSES the counterclaims filed by Defendants Peter W. Guyon and Peter W. Guyon PC Attorney at Law.

7.    Because the remaining claims and counterclaims have either been dismissed or are moot, the court directs the Clerk of Court to close this action.

DATED this 12th day of March, 2026.

BY THE COURT:

Tena Campbell
United States District Judge